## CARLOCK v. WILLARD et al. †

(Court of Civil Appeals of Texas. Dallas.
May 18, 1912. Rehearing Denied
June 22, 1912.)

1. ADVERSE POSSESSION (§ 107*)—ACQUISITION OF TITLE—POSSESSION FOR 10 YEARS.

One who, without deed or recorded memorandum of title, has peaceable and adverse possession of land, claiming title, cultivating, using, or enjoying the same for 10 years, acquires thereby a title to 160 acres of the land so held and used, and may assert his title against the former owner, though his possession ceases after title by limitation.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 624; Dec. Dig. § 107.*]

2. ADVERSE POSSESSION (§§ 109, 13, 25, 96*)—ACQUISITION OF TITLE BY "POSSESSION."

The "possession" in the 10-year statute of limitations means an actual residence on the land, or such cultivation, use, and enjoyment of the same, by such visible and notorious acts of ownership, as will give notice to the owner and others, and such possession may be by tenant and need not extend to the limits of the entire 160 acres; but possession of some definite part of the land is sufficient to confer title to 160 acres or less.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 629–635, 65, 67, 76, 116–120, 533–536; Dec. Dig. §§ 109, 13, 25, 96.*

For other definitions, see Words and Phrases, vol. 6, pp. 5464–5470; vol. 8, pp. 7757, 7758.]

3. ADVERSE POSSESSION (§ 96*)—ACQUISITION OF TITLE—EVIDENCE.

Where one and his ancestors asserted ownership to 150 acres, adjoining a survey on which they lived, and they cleared about 50 acres of the land and cultivated the same, and such acts of ownership continued for over 10 years, title to 150 acres was acquired by limitations.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 533–536; Dec. Dig. § 96.*]

4. TRESPASS TO TRY TITLE (§ 59*)—IMPROVEMENTS — COMPENSATION — GOOD FAITH OF CLAIMANT.

Evidence in trespass to try title held not to show that defendant, defeated in the action, placed improvements on the land in good faith, and he was not entitled to recover for improvements.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 90; Dec. Dig. § 59.*]

5. TRESPASS TO TRY TITLE (§ 30*)—SURVEY—NECESSITY.

Where in trespass to try title there was no dispute as to the boundaries of the land in controversy, and both parties, before the trial, had caused the land to be surveyed and the boundaries distinctly marked, the refusal to order a survey was proper, since an order of survey is by statute unnecessary where there is no dispute as to the lines of the land involved.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 37; Dec. Dig. § 30.*]

6. TRESPASS TO TRY TITLE (§ 30*)—SURVEY—NECESSITY.

Where defendant in trespass to try title pleads title in himself and the land is sufficiently described in the petition, it is not error to refuse an order of survey on motion of defendant.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 37; Dec. Dig. § 30.*]

7. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—SUFFICIENCY.

Where several assignments of error were grouped in the brief and submitted together as a single assignment, while the assignments presented separate and distinct propositions, and the bills of exception were referred to in support of the assignment copied in the brief, without either statement of the substance of the bills or the pages of the record where they might be found, the assignment could not be considered because not presented in accordance with the rules.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

Appeal from District Court, Wood County; R. W. Simpson, Judge.

Action by Mrs. M. J. Willard, prosecuted after her death pending the action by her heirs and the heirs of her deceased husband, against M. D. Carlock. From a judgment for plaintiffs, defendant appeals. Affirmed.

M. D. Carlock, of Winnsboro, for appellant. J. H. Beairn and Harris, Suiter & Britton, all of Quitman, and Jones & Jones, of Mineola, for appellees.

TALBOT, J. This suit was instituted originally by Mrs. M. J. Willard, who died before trial, and thereafter the appellees, as her heirs and the heirs of her deceased husband, J. M. Willard, made themselves parties to the suit and prosecuted it to final judgment. The suit is in the nature of an action of trespass to try title to recover from the appellant 80 acres of land, a part of a 200-acre tract of the Mary Ward survey situated in Wood county, Tex. The plaintiffs claimed title to the land by deeds of conveyance from J. A. Weaver and W. J. Goodson and O. E. Roberts, antedating many years the claim set up by the defendant, and by limitation of 5 and 10 years. The defendant pleaded not guilty, and improvements in good faith of the alleged value of $1,200, and prayed for judgment quieting his title, and that in the event the plaintiffs recovered the land that he have judgment for the value of his improvements. The case went to trial with a jury on the 27th day of April, 1911, and at the conclusion of the evidence the court instructed the jury to return a verdict in favor of the plaintiffs for the land in controversy, and to find against the defendant on his plea of improvements made in good faith, and against the plaintiffs on their plea for damages and rents. The jury returned a verdict as directed by the court, and judgment was entered in accordance therewith. From the judgment against him the defendant appealed.

The plaintiffs introduced in evidence a patent to the Mary Ward league of land, containing 4,605 acres of land situated in Wood county, Tex. Then a deed from O. E. Roberts to J. M. Willard, under whom they claim, as follows: "Know all men by these

presents that I, O. E. Roberts, for a valuable consideration to me paid, the receipt of which is hereby fully acknowledged in consideration of which I have bargained and sold and by these presents sell and convey unto J. M. Willard the following tract or parcels of land, to wit, commencing at the S. W. corner of a tract of land sold by me to G. V. Wilson situated about two miles east of Winnsboro on the west boundary line of the Mary Ward league. From said Wilson corner running east the depth of 100 acres, thence south with Wesley Leathers west B. line the depth of 200 acres to corner, thence west to the west B. line of the Mary Ward league, thence north to the place of beginning, containing 200 acres of land to have and to hold the same under him and his heirs, and assigns. I, the said O. E. Roberts, sell, release, convey and deliver unto the said J. M. Willard all my rights, title, claim and interest of said 200 acres of land on the Mary Ward league, warranting and defending the same against the claim of myself, my heirs or assigns. [Signed] O. E. Roberts. Witnessed by William N. Willard and C. Stem on the 29th day of November, 1879." Recorded on the 8th day of August, 1907, in volume 19, page 26. There is some oral testimony to the effect that this same 200 acres of land had been conveyed, on the 28th day of October, 1865, by the grantor in the deed copied above to J. A. Weaver and W. J. Goodson, and by them deeded to J. M. Willard on the 4th day of February, 1870, and that said deed of November 29, 1879, was executed by the grantor therein directly to the said J. M. Willard for the purpose of correcting the description of the land therein mentioned, but no deed from O. E. Roberts to Goodson and Weaver or from Goodson and Weaver to J. M. Willard was introduced in evidence. It was also shown by parol evidence without contradiction that the 200 acres of land described in this deed was a part of the said Mary Ward league of land, and that the west boundary line of said league survey is also the west boundary line of said 200-acre tract; that the 80 acres of land in controversy in this suit is included in the boundaries of the 200 acres, and is the southern part of the same. The evidence further shows that 50 acres of the 200-acre tract were sold by J. M. Willard to W. N. Willard about 25 years before the institution of this suit, and that the plaintiffs' ancestors during their lifetime, and the plaintiffs since their deaths, were in peaceable and adverse possession of the remainder of said land, claiming the same and paying taxes thereon and using and cultivating a part of the same, including a part of the 80 acres in controversy in this suit, from the year 1870, up to the time the defendant entered upon the same and took possession of said 80 acres, which was some time in the year 1906.

The defendant introduced in evidence a deed from W. H. Christensen, the administrator of B. W. Musgrove, dated the 6th day of December, 1872, conveying, among other parcels of land, lots 22, 23, 24, and 25 of the Mary Ward survey, beginning at the southwest corner of the Moore & Goodson tract, a stake on the Mary Ward west line; thence east 1,330 varas, passing southeast corner of same to lot No. 21 and the north corner of lot 23; thence south with the east line of lot 23 and 25, 699 varas, to stake on the southeast corner of lot No. 25; thence west with the north B. line of lots 27 and 26, 330 varas, to a stake on the northwest corner of lot 26; thence north 699 varas to the place of beginning, estimated to contain 160 acres of land. This deed was acknowledged the 6th day of December, 1872, and recorded first time on the 7th day of December, 1872, in deed records of Wood county. The courthouse of Wood county was burned and all the records destroyed on the 11th day of December, 1878, and the administrator's deed above referred to was recorded the second time in deed records of Wood county on March 4, 1880. This deed, as appears from the record, recites: that "whereas, the district court of Wood county, on the 17th day of June, on the application of W. H. Christensen, the administrator of B. W. Musgrove, deceased, ordered the lands herein and after described belonging to be sold for the payment of debts, and that by virtue of said order the administrator, after first having advertised said land in three public places, one of which was courthouse door of Wood county, for more than 20 days next preceding the 6th day of August, 1872, proceeded to sell said land and lots in not less than 10 acres and not more than 40 acres in same as ordered by the said district court, in lots numbering from 1 to 37, inclusive of the west half of the Mary Ward survey of land in Wood county, Texas. That J. J. Jarvis at such sale became the purchaser of lots 12, 13, 17, 18, 22, 23, 24, and 25 for the sum of $461.13 on a credit of six months, and that said sale was reported to the court and approved and deed ordered made to purchaser," etc. The defendant next offered in evidence a deed from J. J. Jarvis to himself, dated the 20th day of September, 1906, and recorded on the 21st day of September, 1906, in deed records of Wood county. This deed is a general warranty deed and conveys all that certain land, or parts of land situated in Wood county, Tex., about 2½ miles east of the town of Winnsboro on the Mary Ward headright survey, beginning at the northwest corner of block No. 25 of said subdivision of said survey, at a stake for corner from which a red oak brs. 30° S., 6 vrs. a post oak brs. 70° E. 7 vrs.; thence east with the Campbell north line 632 vrs. to a stake for corner from which a red oak brs. S. 60° E. 5 vrs. a red oak brs. 45° W. 6 vrs.;

thence north to the south line of the Garrison land; thence west with the Garrison south B. line to a stake for corner; thence south to the place of beginning containing 40 acres of land more or less. This deed has the following recitation: "It is only intended to convey all of the land yet unsold on the Mary Ward survey that has heretofore been and is now owned by me. And this deed shall convey all of my interest not heretofore sold by me, but no more." The defendant also introduced evidence to the effect that, since the date of his deed from J. J. Jarvis, he had made valuable and permanent improvements on the 80 acres in controversy.

It is assigned that the court erred in "instructing a verdict for the plaintiffs, because the same was not authorized or justified, either by the law or by the evidence in this, that the plaintiffs did not show themselves entitled to recover by limitation of either five years or ten years, and the plaintiffs did not show any title to the land in controversy, as the deed under which they claimed did not describe any land situated in Wood county or any other county, or in Texas, or any other state." We do not think this assignment is well taken. The plaintiffs were not entitled to recover on their claim of title by limitation of five years, and if it be admitted that their deed from O. E. Roberts was insufficient to convey the land in controversy, because it did not recite specifically that the same was situated in Wood county, Tex., still, in our opinion, they were entitled, by law and the undisputed evidence, to recover the land in controversy under their plea of title acquired by the statute of limitations of ten years.

[1] A person, without a deed or recorded memorandum of title, having peaceable and adverse possession of land under the statute of this state, claiming, cultivating, using, or enjoying the same for a period of 10 years, acquires thereby title to 160 acres of the land so held and used. The running of the period of limitation in favor of such adverse possession confers title which such person may assert against the former owner, though his possession cease after his title by limitation is acquired. Spofford v. Bennett, 55 Tex. 293; Branch v. Baker, 70 Tex. 190, 7 S. W. 808; Mims v. Rafel, 73 Tex. 300, 11 S. W. 277; McGregor v. Thompson, 7 Tex. Civ. App. 32, 26 S. W. 649. It is said that the effect of the statute is to make the period of prescription mature the inferior title of the possessor into the superior title.

[2] The "possession" referred to in the statute "may mean an actual residence on the land, or such cultivation, use, and enjoyment of the same, by visible, notorious acts of ownership, as would give notice to the owner and others of such adverse possession." Kimbro v. Hamilton, 28 Tex. 561.

And such possession may be by tenant (Warren v. Fredericks, 76 Tex. 647, 13 S. W. 643; Chamberlain v. Pyras, 81 Tex. 511, 17 S. W. 50), and need not extend to the limits of the entire 160 acres. Such possession of some definite part of the land will be sufficient to confer upon the possessor title to 160 acres of the land or a less number of acres.

[3] The plaintiffs in this case claimed and sought to recover only 150 acres of land. Their ancestors originally claimed 200 acres as described in the deed from O. E. Roberts to J. M. Willard; but, after the sale of 50 acres of the land to W. N. Willard, they claimed, and the plaintiffs only claim, the remainder thereof, and for which they recovered judgment. The evidence conclusively shows that plaintiffs were the sole surviving heirs of J. M. Willard and M. J. Willard, deceased; that J. M. Willard and M. J. Willard, under whom plaintiffs claim, were husband and wife; that they took possession of the particular 200 acres attempted to be conveyed to them by Weaver and Goodson and O. E. Roberts, as far back as 1870 or 1872; and that they and their tenants had and held peaceable and adverse possession of the same (except the 50 acres sold to W. N. Willard), cultivating, using, and enjoying a part thereof, for more than 10 consecutive years before their deaths. They did not actually reside on the land, the house in which they lived being on the Matthew Dial survey, an adjoining survey, and only a very short distance away; but, as stated, they cleared and had in cultivation a part of the 150 acres claimed by them in the Mary Ward survey. The plaintiffs, Stacey and wife, live on the Matthew Dial survey; but they have about 50 acres of land cleared and in cultivation on the 150-acre tract claimed by plaintiffs in this suit. The testimony further shows that J. M. Willard and M. J. Willard, from the time they took possession of the land in controversy up to the date of their deaths, and the plaintiffs since their deaths, at all times asserted ownership of said land. Among other witnesses testifying to the facts stated, L. L. Willard said: "I am well acquainted with the land in controversy and have been for more than 40 years. I was present when O. E. Roberts executed a deed to J. M. Willard for 200 acres of land out of the Mary Ward survey. This deed was witnessed by Chris Stem and my father, W. N. Willard. The land was surveyed at that time. I have been around this land many times and have seen the lines and corners that were marked by the surveyors at that time. I know where the corner of the J. V. Wilson tract of land is; that is, the southwest corner of said J. V. Wilson tract. The Wilson land was north of the Willard land on the Mary Ward survey. The 80 acres of land in this controversy is

the south part of the 200 acres and is included in these boundaries. I came to Texas in 1870, and, when I came, I found my uncle, J. M. Willard, in possession of the 200 acres. He had about 10 acres cleared and in cultivation when I came. He afterwards cleared about 20 acres more of this 200-acre survey of which the land in controversy is a part. J. M. Willard and his heirs have used and cultivated this land each year consecutively from 1870 until now." Again, he testifies: "Weaver and Goodson sold this land to J. M. Willard. They bought the land from O. E. Roberts. After Weaver and Goodson had made J. M. Willard his deed, it was discovered that there was a mistake as to the boundaries of the Mary Ward and Matthew Dial surveys. After that mistake was discovered, O. E. Roberts executed a deed to J. M. Willard to the 200 acres of land." Again, he testified: "I had a shingle mill on this land more than 20 years ago, and at that time I bought the timber off of this land from J. M. Willard and had his permission to put the mill on the land. I paid him for the timber I cut off of this 80 acres. J. M. Willard sold my father the 50 acres out of the northeast corner of the 200-acre tract more than 25 years ago. My father took possession of the 50 acres more than 25 years ago. After that 50 acres was sold, it only left J. M. Willard 150 acres out of the Mary Ward survey. I have lived near and known this land now in controversy for more than 40 years and never heard of any one claiming it except J. M. Willard, until the defendant, M. D. Carlock, took possession of it. Stacey and his wife now live in the house built by B. Willard, which is near the line but on the Matthew Dial survey. He cultivates land on the Mary Ward survey and has about 50 acres cleared and in cultivation on that survey."

We think the appellees were entitled, under the undisputed evidence, to recover the property in controversy under the plea of title by limitation of 10 years. There was no evidence of sufficient probative force to authorize a finding by the jury that they and those under whom they claimed had not had and held adverse possession of the land within the meaning of the statute for the period of 10 years. On the contrary, such adverse possession was conclusively established by them, and the court did not err in peremptorily instructing a verdict in their favor. That the number of acres of land in cultivation may have been comparatively small does not materially affect the question. The possession, cultivation, and use of the property relied on and shown by appellees constituted such visible acts of ownership as gave notice to all other persons of the assertion of an adverse and exclusive right to the land, and this possession and use, being unbroken for the period of 10 years, was

sufficient to mature their title by limitation. This view of the case renders it unnecessary for us to determine what right or title the plaintiffs acquired to the land in controversy by virtue of the deed from O. E. Roberts to J. M. Willard, dated November 29, 1879. Having held that they acquired title to the land by limitation, we need not consider and determine that question.

[4] We are further of the opinion that the court did not err in refusing to submit to the jury the question of improvements in good faith. The uncontroverted evidence shows that the improvements placed upon the land in controversy by the appellant were not put there, in contemplation of law, in good faith. The deed from Jarvis to him and under which he claims did not describe the land in controversy. It purported to convey by metes and bounds a tract or parcel of land which constituted no part of the land sued for in this action, and the defendant himself testified: "When Mr. Jarvis made me this deed, he did not describe the land in controversy by metes and bounds. Before I consummated the deal, I found the deed from Weaver and Goodson to J. M. Willard. I don't think I went and looked at the ground before I bought. I understood that possibly Willard had some claim to the land before I bought. I bought all the Jarvis land not sold. I paid him $320 for it, according to the figures that would be $8 per acre. I don't know that was what he had been holding the 40 acres of land for. I wrote the deed myself and put that clause in it. It is a fact that after he (Jarvis) executed this deed that I had written I tried to get Jarvis to make a new deed describing these two blocks of land in controversy, and Jarvis refused to do that. Jarvis never at any time told me that he owned this land in controversy, and it is also a further fact that he would not sign a deed to me that described the land in controversy by metes and bounds. He declined to sign a deed with that description in it. I don't know that it is a further fact that, before I went into possession of any part of this land, the Willards notified me that it was theirs and for me to keep off of it. Mr. Lem Willard testified to that, and I had forgotten about it till he testified yesterday." Defendant further testified that he went to Mrs. Willard in her lifetime and before he made any improvements on the land, and saw one of the deeds she held to the land. According to the undisputed testimony as a whole, and particularly the testimony of the defendant himself, he was not entitled to recover for any improvements he may have made, and the court correctly instructed the jury to find against him on that issue.

[5] The contention that the court erred in refusing to appoint a surveyor to survey the land in controversy and to survey and establish the number of acres improved and

the character of the improvements made by the defendant is not sustained. There was really no dispute as to the lines or boundaries of the land in controversy, and, if defendant did not in fact admit that he was in possession of lands included in the plaintiffs' claim or title, that fact was conclusively established by the evidence. The evidence is without dispute that the 80 acres claimed by the defendant is a part of the 150 acres claimed by the plaintiffs; that both the plaintiffs and the defendant caused said lands to be surveyed before the trial of this suit; and that their respective boundaries were distinctly marked and well understood by the parties when the request for the survey was made by the defendant, and so was the character and extent of the improvements which had been placed upon the land by the defendant. An order of survey is, by statute, made unnecessary where there is no dispute as to the lines of the land involved in the litigation, or where the defendant admits that he is in possession of the lands or tenements included in the plaintiffs' claim or title.

[6] Again, where the defendant in an action of trespass to try title pleads title in himself, and the land is sufficiently described in the petition, it is not error to refuse an order of survey on motion of the defendant. Castro v. Wurzbach, 13 Tex. 128. It is clear the defendant suffered no injury by the refusal of the court to order a survey of the land, and the assignment complaining of that action will be overruled.

[7] Appellant's assignments of error Nos. 2, 3, 4, 6, and 7 are grouped in the brief and are submitted in one assignment numbered 5. The assignments present separate and distinct propositions, and as many bills of exception as there are assignments are simply referred to in support of the one copied in the brief, without either a statement of the substance of the bills or the pages of the record where they may be found. The assignment is therefore not presented in accordance with the rules and cannot be considered.

The assignment complaining of the court's action in refusing to permit the defendant to introduce in evidence certain field notes of 167⅜ acres of land situated in Wood county and claimed to have been made for J. M. Willard by N. T. Dickinson as surveyor of said county many years ago, and the assignment asserting that the court erred in not instructing the jury to find for the defendant one-half of the land in controversy upon the theory that one of J. M. Willard's daughters was not claiming any of the land, are without merit and will be overruled.

We have carefully considered all the assignments of error, and, because we are of opinion that none of them point out reversible error, the judgment of the lower court is affirmed.