## W. T. CARTER & BRO. v. HOLMES.
### No. 2784.

Court of Civil Appeals of Texas. Beaumont.
July 3, 1935.

Rehearing Denied Sept. 25, 1935.

Wheat & Sandlin, of Woodville, and Baker, Botts, Andrews & Wharton, of Houston, for appellants.

Lowe & Hightower, of Woodville, for appellee.

WALKER, Chief Justice.

This was a suit in trespass to try title by appellee, C. C. Holmes, filed on the 22d day of February, 1934, against appellant, W. T. Carter & Bro., in the district court of Tyler county, to recover the title and possession of 100 acres of the Francis Kriner survey, with judgment in favor of appellee, based upon the affirmative answer of the jury to the following question, the only question submitted by the court's charge: "Did the plaintiff, C. C. Holmes, have peaceable and adverse possession of any portion of the tract of land in controversy, cultivating, using or enjoying the same for ten years or more prior to the institution of this suit on the 17th day of January 1934?"

Appellant contends that the verdict of the jury was without support in the evidence. C. C. Holmes testified as follows, questions and answers reduced to narrative:

"I am the plaintiff in this case here. The 100 acres of land for which I am suing is located near the southwest corner of Tyler County on the Francis Kriner Survey. I know where it is located with reference to lines and corners. I have one acre and a quarter of that land in my possession; I have had it in my possession ever since 1922. I have a field there; I opened up and fenced that field in 1922. I built a rail fence around it. I have farmed it each and every year since then; raised different crops on it, up to and including 1934. I claim 100 acres there. I have been to all the lines and corners.

"I am forty-one years old; I was born in Tyler County on the Francis Kriner Survey. As far as I remember there are 640 acres in the Francis Kriner Survey. My father was J. M. Holmes. My father is living; he lives on this tract of land, on the Kriner Survey. It is between three and four hundred yards from his house to the line of this 100 acres of the Kriner Survey; he lives north of it. He has been living there about twenty-five years. I am living with him. I have been living there at that place ever since 1922; I have been living there with my father. Before that time I lived at Saratoga. My grandfather was W. F. Holmes; he lived on this 100 acres I'm talking about. I don't know how long he lived there; if I was going to say how long it would be somewhere around thirty-five or forty years; maybe fifty. I was born on this survey back south of the 100 acres. As far back as I can remember this 100 acres was known as the old W. F. Holmes place. My grandfather was then living on it. His wife was Lettie Holmes. The home place, the old Holmes house was located near the southeast corner of the 100 acres. The little field I am talking about is located near the northwest corner of the 100 acres. There was at one time an old house at that place; my father lived in that house; he moved there in 1905 and lived there until in 1909. He had some land fenced and in cultivation at that time; I don't know how much. My grandfather's old house was about four or five hundred yards from this little field of mine. So far as I can

recollect my grandfather, W. F. Holmes, and my grandmother lived at this old place; I don't know how much land they had in cultivation around there, there is quite a field though; the house is still standing. There is somebody living in it. A couple of my aunts are living in it. Their names are Clemmie and Eliza Holmes. I fenced this little field of mine in 1922 in the fall, I can't remember what date it was; somewheres nearer September or October, something like that. When I went there to fence there it once had been an old field around there and it had growed up in saplings and I went there and cut them down; that was the old farm my father cultivated from 1905 to 1909. After he left there in 1909 nobody lived there in that house; it was moved. That land was cultivated after 1909.. My brothers cultivated it and I helped; I worked in it some myself; there was some of it worked up until 1921; it was cultivated each and every year from the time my father lived there in 1909 up until 1921; we were just tending it, no certain parties that we were tending it for; we were just tending it and making what we could off it. I was living with my father then. I am married. I have been married since 1921. Up to that time I did not live with my father all the time, I was off at work part of the time. My brothers Jesse and Alvie worked that place with me; they are younger than I am. When we worked that place we were living with our father; he was living north of the 100 acres then; he was up there where he is living at this time. I continued to live with him until I went to public works; I don't remember the date when I went off. Jesse and Alvin continued to live with him until 1921. When I was working that place in 1909 I was working it for my father. My brothers continued to work it until 1921; it was thrown out then. It stayed out in 1921 and 1922; I went there in the fall of 1922 and cleared out this little patch. I don't know how large that old field place was; it was twelve or fifteen acres I guess; where I opened my little patch was not exactly in the middle of the old field; it is all grown up around this little field. The trees that surround it, the place where the old field was, I suppose the biggest ones are ten or twelve inches through. When I fenced this patch I was living there with my father, where he is now, north of this 100 acres. I first made a crop there in 1923.

"* * * In addition to this little patch I had other land I cultivated; through the winter during that time from 1922 to 1930 I worked at public works; it is not a fact that after I gathered my corn crop —say along about September—that cattle in the community just went in and out, the fences fell down and the cattle would run in there; they didn't all the time; sometimes they broke in; I would go and fix up the fence and put them out.

"* * * I have been living where my father is living from 1922 up until the time I filed suit. Once in a while I took my wife over there to that little patch and she would help me; maybe I would take one of the boys who happened to be around; maybe they would help me. Neither of my brothers helped me to clear it. That patch is somewhere between four and five hundred yards from where my two aunts live; they were raised there, out close to there.

"* * * From this little patch to the nearest public road is somewhere around three hundred yards I would say; it is the road known as the Village Mills-Livingston road; there is a road leading from that public road to my little field; it is a car and wagon road; it is more than a trail, there has been several cars in there; it aint no graded road but then it is a good, smooth road. I don't know how close you have to get up to this little field before you can tell it is there, I never stepped it off, but at the present time you have to get tolerable close because them saplings have growed up all around. I know my father was one of the Holmes heirs who sold that land to Mr. Carter, W. T. Carter. It is not a fact that me and my brothers have at all times worked that, knowing that it either belonged to our father or that we were working it under him; in 1909 we were living there with him and he had us working it, we were working under him at that time; we didn't pay him any rent; we worked it for the use of the whole family at that time; I did that up until 1922; I began working it for myself in 1922; in 1923 I made a crop on it. It laid out in 1921 and 1922. I told my father that I was going down there and claim the land that he had sold to Mr. Carter; he didn't give me any answer about it; I was living in the home with him and I have continued to live there ever since. I haven't rendered it for taxes, nor paid any taxes on it. I didn't do all my work on it right straight along,

I done my work at different times during the year; it was only one or two days at a time, sometimes I worked it three or four days; after I gathered my crop I was fixing up the fence in case the cattle broke it down. The woods have never burned off there and burned my fence. I have never rebuilt that fence, just built on top of it; a man might walk up there and step over it in places. It has not been that way most of the time for the past ten or eleven years.

"* * *. I suppose you would call it that my father lives with me because he can't get about, he is paralyzed with rheumatism. He has been in that condition twenty-nine years, he cannot walk at all, he is completely helpless. He is dependent on me. The road leading from the public road to that field has been kept up and open at all times since 1922. It is in such condition that a wagon could drive in there, and a car. When I went out there and fenced up this field I told my father I was going to claim it and I told several other people.

"* * * I know about when the sale was made to W. T. Carter & Brother; it was about 1917. My aunts were living on this 100 acres at that time. My aunts moved off then, in the same year. The place was vacant after they moved off. They came back and have been there continuously since that time. They moved off again in May, 1925. They left the 100 acres entirely vacant at that time except for my field; they knew that I was claiming that 100 acres. The produce I grew in this field that I had down there, I used the corn for bread and horse feed and the watermelons I used to eat; I used it all for mine and my family's support. I have a wife and one child.

"* * * W. F. Holmes died in 1917; he died a short time before November 9, 1917, the date of the deed. He left these two daughters of his in the old home; he worked the land around the old place until he got so old and blind he couldn't, and with the cancer. The aunts continued to live there in the old house until 1917. They moved to Kountze; they moved in a house by themselves; there was another aunt and uncle lived there, in this same old house, the aunt's name was Rebecca; the uncle's name was Ripley, R. W. Holmes. They all moved away at the same time. They stayed away from there somewhere around three months, then they moved in again; it was sometime early in 1918 that they moved back. They stayed there until 1925, in May, after they moved back. I am sure they moved everything when they left there. I don't think it is true that they merely went to Kountze to stay during the cold weather and then moved back on this place early in the spring; I didn't think they were just off on a visit at Kountze. When they came back in 1918 and while they were living there was when I opened the little field. I saw L. T. Sloan when he came in there and made the trade to buy the land. He didn't make a trade with them that they were to live on there and hold the land for him and W. T. Carter and Brother as long as they wanted to. I don't know anything about a trade of that kind. There was an oil lease fixed up on this land; these two aunts signed one."

Mr. M. M. Reese, Mr. Geo. Williford, Mr. Jim Youngblood, Mr. Eddie Reese, Mr. W. H. Sumrall, and Mr. Frank Holmes testified that they were neighbors to appellee; that they lived in the same general neighborhood with the 100 acres of land in controversy; that they were acquainted with the land and had known it for a long time; that they knew of appellee's claim to the land and that he had talked with them about his claim; that they knew the extent of his claim and for years had seen it frequently, on an average of about once a month during the years, while hunting and going through that part of the neighborhood. They testified further that appellee had cultivated and claimed it every year since 1922, to their personal knowledge. Miss Eliza Holmes testified that she was the aunt of appellee; that in 1917 she and the other joint owners of the 100 acres of land executed a warranty deed to it, through which appellant now holds. She testified further that, at the time of the execution of this deed, she and her sister were living in an old house on the land, but, immediately after execution of the deed, they moved away to the town of Kountze, where they stayed for about three months; that at the end of three months they returned to the old home without the consent of appellant and without permission from any one; having no other place to go, they simply went back to the old house; they stayed there until 1925, but asserted no claim of any kind or character whatever to the premises (the effect of her testimony was to make them naked trespassers on the land);

that during this time they knew of the claim of appellee, knew that he had worked, cultivated, used, and enjoyed the land he had under fence since 1922, and had claimed the entire 100 acres since 1922; she denied that appellant, or any one acting for it, or any one else, at the time of the execution of the warranty deed to the premises, gave them permission to stay on the land, or to occupy it, or to use it for any purpose whatever.

■ The analysis of the quoted testimony supports the verdict of the jury. The testimony, as summarized, brings this case exactly within the principles announced by this court in W. T. Carter & Bro. v. Brown, 230 S. W. 889, Petty v. Griffin, 241 S. W. 252, and Walker County Lumber Co. v. Sweet, 40 S.W.(2d) 225. We merely refer to these authorities for the principles of law supporting the jury's verdict.

Appellant seeks to distinguish the facts of this case from the cited cases in the following respects:

(a) W. T. Carter & Bro. v. Brown:

"In the Brown Case certain of the facts were similar to those involved here. There three or three and one-half acres were enclosed, and here, between one and one-half and one acre was enclosed. There, as here, the claimant did not reside on the land but resided in the home of his father nearby. There, as here, the evidence was sufficient to justify the finding that some kind of a crop had been raised on the enclosed tract each year. But here the parallel ends. In the Brown Case there was no showing that any others were in possession of the tract sought to be claimed; here, two of the vendors to W. T. Carter & Bro., who had given warranty deeds, lived on the old home place, and were not shown to be in possession in subordination of the Holmes claim, and who were presumed to be in possession in recognition of the title they had conveyed, under the Commission of Appeals case of Scott v. Rodgers, 6 S.W. (2d) 731."

(b) The Griffin Case:

"Appellee's counsel has strenuously urged that the case of Petty v. Griffin cited by this court in 1922, 241 S. W. 252, constitutes authority for the proposition that Holmes made out a case here. In two pivotal respects Holmes has failed to meet the requirements met in the Griffin Case. The concurrent possession there of the tract involved was by others who were found under the evidence to have been occupying the land in subordination of Ivy Griffin's claim. The evidence there was prima facie enough; here there is none. There, possession was by those who shared the produce of the place with the claimant. There is no evidence in the record here shown that the possession of those occupying the old home place was in subordination of C. C. Holmes' cultivation of the remote tract involved. In the second place, those in concurrent possession in the Griffin Case were not shown to have been grantors to the record owner, remaining in possession of the primary and dominant improvement, with the attendant legal consequences pointed out in Scott v. Rodgers. It may also be said in this connection that there was no question involved in the Griffin Case of the visibility or openness of the possession and this element is in sharp contrast with the inaccessibility and lack of openness reflected by the circumstances here."

(c) The Sweet Case:

"In that case the question of openness and visibility as distinguished from remoteness and virtual inaccessibility was not involved. As we recall appellee's counsel's contention made on oral argument, it is to the effect that the Sweet Case gives Holmes some support on the question of exclusiveness of possession, or stated conversely, the effect of concurrent possession by others. The question in that case was whether or not one Jim Sweet was in concurrent possession of the premises during the ten years involved. Sweet was not a grantor of the record title remaining in possession. Sweet was shown by the evidence there to be a tenant of the claimant. The evidence showed there, as reflected by the court's language on page 228 [of 40 S.W.(2d) 225], that Jim Sweet was in possession under a rental contract with the claimant, Charlie Sweet. By no stretch of the imagination can this case constitute precedent for Holmes' claim here."

The principal points of distinction are: (a) The possession of appellee was not exclusive. The evidence is conclusive that the Misses Holmes were upon the land as naked trespassers, asserting no claim thereto, occupying the land with knowledge that appellee was in actual possession, cultivating, using, and enjoying a part of the 100 acres, claiming to the extent of the

boundaries of the 100-acre tract. Appellant rests its distinction primarily upon the Commission of Appeals opinion in Scott v. Rodgers, 6 S.W.(2d) 731. In our judgment that case does not rule the facts of this case. In Scott v. Rodgers the announcement was that a vendor remaining in possession, doing nothing whatever to give his vendee notice of his adverse claim, with no community knowledge of his claim, did not mature a limitation title against his vendor, holding under him through warranty deed. In this case appellee was not a vendor of appellant and never was in privity in any way with appellant. Appellant's vendors immediately vacated the land after the execution of their deed and remained away for about three months, moving back as naked trespassers, with no right of entry and with no claim of right to the land, and without assertion of any right or claim of right to, or interest in, the land in controversy. The issue of whether or not appellant's vendors could have matured a title by limitation is not before us, because they are not claiming the land. Appellee was in actual possession, asserting a claim notorious throughout the entire community. (b) It is contended, further, that appellee's claim was a secret claim, hidden behind a thick growth of trees and underbrush, so located as not to give appellant notice of its extent; and (c) that the claim was not open. The testimony of the witnesses answers those contentions. It was near a highway, with a road leading up directly to the improvements. Its existence was known to the citizens living near the land, and appellee so published his claim that, from the testimony of the many witnesses in this case, it was known by all his neighbors and friends.

It is our conclusion that the cases cited above are clearly in point, ruling all issues of fact in favor of appellee.

The court did not err in refusing to give the following special charge requested by appellant: "That to constitute peaceable and adverse possession, as that term is applied to the facts in this case, the possession must be open and visible and notorious to the extent that it would give notice to the record owner that the occupant is claiming the full 100 acres of land in controversy."

The charge given was within the language of the statute and fully presented to the jury every essential element of the ten-year statute of limitation.

It follows that the judgment of the lower court should be in all things affirmed and it is accordingly so ordered.