SCOTT v. RODGERS et al. (No. 1080–4970.)

Commission of Appeals of Texas, Section A. May 23, 1928.

1. **Adverse possession ⬥⊃53—Periods of vacancy broke continuity necessary to prescriptive title, since cultivation, use, or enjoyment is essential.**

Periods of vacancy, lack of occupation, use, etc., in person or by tenants, after time plaintiffs' family moved away, broke continuity requisite to prescriptive title by possession, since cultivation, use, or enjoyment of land is essential to actual and visible appropriation, without which possession cannot ripen into prescriptive title.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adverse Possession.]

2. **Adverse possession ⬥⊃63(4)—To acquire title by prescription, there must be possession of such character as to indicate unmistakably an assertion of claim of exclusive ownership in grantor retaining possession (Rev. St. 1925, arts. 5510, 5514, 5515).**

In order for grantor, retaining possession, to acquire title by prescription, there must be in addition to ten years of continuous, peaceable possession with cultivation, use, or enjoyment, under Rev. St. 1925, arts. 5510, 5514, a possession, etc., of such character as to indicate unmistakably an assertion of claim of exclusive ownership, under article 5515.

3. **Adverse possession ⬥⊃63(4)—Grantor's possession as commenced, or retained, was consistent with deed and was not, in respect to recent grantee, notice of hostile claim.**

Grantor's possession as commenced or retained was consistent with deed, since delivery of seizin is not required, and such possession was not, in respect to recent grantee, notice of hostile claim.

4. **Adverse possession ⬥⊃31—Owner must ascertain extent, meaning, and locality of settlement made without his authority; but, if settlement is with his authority, it is not notice of adverse claim.**

Owner must know boundaries of his own land—that is, ascertain extent, meaning, and locality of any settlement made without his authority—but, if settlement is with his authority, its making lacks notice of adverse claim.

5. **Adverse possession ⬥⊃63(4)—Use, cultivation, etc., by grantors, retaining possession, in same manner as before conveyance, was not sufficient to constitute adverse possession.**

Use, cultivation, improvements, etc., by grantor and wife, retaining possession throughout period of occupancy, in same manner they had done such things prior to conveyance or at beginning of their occupancy with that title outstanding, was not sufficient to constitute adverse possession since it did not of itself import a hostile claim.

6. **Adverse possession ⬥⊃70—"Claim of right inconsistent with and hostile to claim of another" includes more than mental process (Rev. St. 1925, art 5515).**

"Claim of right inconsistent with and hostile to claim of another" includes more than mental process in possessor; there must be external circumstances showing inward intention, under Rev. St. 1925, art. 5515.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Claim of Right.]

7. **Adverse possession ⬥⊃85(4)—Evidence held not to show adverse claim open in its nature by grantor retaining possession, and did not support claims of prescriptive title (Rev. St. 1925, arts. 5510, 5514, 5515).**

Where plaintiff's ancestor conveyed land by deed, but remained in possession, evidence *held* not to show adverse claim open in its nature, and did not support claims of prescriptive title, under Rev. St. 1925, arts. 5510, 5514, 5515.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by Mrs. Annie Rodgers and others against Mrs. James Leven Scott. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (297 S. W. 624), and defendant brings error. Reversed and rendered.

McCormick, Bromberg, Leftwich & Carrington, of Dallas, for plaintiff in error.

Marion S. Church and Carter & Wilson, all of Dallas, for defendants in error.

---

⬥⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

NICKELS, J. The question presented is whether there be evidence tending to show the ten-years' prescriptive title (articles 5675–5682, R. S. 1911; articles 5510–5515, R. S. 1925) claimed by defendants in error and adjudged to them by the district court (without aid of a jury).

Since the opinion of the Court of Civil Appeals (297 S. W. 624) in respect to essential matters exhibits but ultimate conclusions, a somewhat detailed statement of facts shown in evidence is necessary here.

1. James English and wife in 1888 acquired a rectangular tract of land—142 feet north, south by 500 feet east, west—near Dallas. They inclosed the tract by fence, and put on it a cross fence or fences, a house, etc., and thereon established their home and commenced cultivation of the parts not occupied by the improvements—all in 1888.

March 24, 1890, by general warranty deed and for a consideration of $450 (paid) they conveyed to McAleer (for Dallas Land Loan Company) a portion (of the tract) thus described: Commencing at the southeast corner; thence north 132 feet; thence west 300 feet; thence south 132 feet; thence (to place of beginning) 300 feet. By mesne conveyances and devise (McAleer to Dallas Land Loan Company in 1890, Dallas Land Loan Company to C. E. Bird, assignee, at an undisclosed date, Bird to Marsalis, at an undisclosed date, Marsalis to David Scott, at an undisclosed date, and Scott by will) that title got into Mrs. Jane Leven Scott. The deed from English and wife was delivered, but they were left in possession.

Some time in 1890 (inferably, about the time of the conveyance mentioned) a "ten-foot strip" along the north boundary of the tract was by deed conveyed, as a "donation," to Marsalis for purpose of a right of way for a street railroad then built (or being promoted) into the neighborhood. The railroad was never built on the "strip," and English and wife remained in possession.

The connection (if any) between McAleer and Dallas Land Loan Company, on the one hand, and Marsalis, on the other, and between the two conveyances, is not shown, except that Marsalis, on an undisclosed date, connected with the McAleer deed.

Except for what has been stated, evidence of the circumstances in which the conveyances were made is in the testimony of Rodgers (husband of Annie, daughter of English). Rodgers pointed out on a map the land conveyed to McAleer. About this he said "he doesn't know as he ever heard Mr. English say anything about why he conveyed it." Rodgers then pointed out (on the map) the "ten-foot strip" donated to Marsalis "for a street car line," and testified thus:

"I was not there with him [English] and did not know all about it. I can tell you exactly the way it was. To my very best knowledge English said he let Marsalis have it for the benefit of a right of way donation * * * for that dummy line, and it was about three-quarters or a half of a mile away [we assume he meant the "line" was subsequently built that distance from the English property] and the old man [English] kicked about it. He didn't say anything about where the dummy was to come; he was a man that never talked much. It was supposed to come by his place there; it was natural a man would not want to give a piece of land that didn't benefit him. He didn't say anything, only he claimed it was his. He was in possession and claimed it was his, and that he was paying taxes; that is my understanding. The railroad was supposed to go across, right close to his line; that was his understanding about it; and it didn't come there, and he was not pleased with it. * * * My boy ran a fence in that ten-foot strip [in 1924 or 1925 as shown by other testimony], but I don't know what he did that for. He fenced that ten-foot strip the old man claimed he owned. The old deed [i. e., the McAleer deed] leaves a ten-foot strip—he reserved that. That is the strip [which Rodgers' son fenced in 1924 or 1925]. The old man [English] claimed the property all the way along."

Mr. and Mrs. English remained in actual possession, use, and cultivation of the entire tract until death of Mrs. English in 1900. Mr. English continued that possession, etc. (with a second wife married in 1901), until some date in 1916, when he sickened, and he and the family moved to the home of his wife's mother, thence he went to a hospital, thence to the home of a son, where he died in 1917. Mrs. English (the second) died "about a month later." About the tract as a whole, Rodgers said:

"He [English] never cut off any of that tract and when the old man died it was just like he kept it; it was fenced all the time from the time he bought it until he died. The land was all used and the old man claimed it as his land."

The family or constituents, or "heirs," never returned to or took personal actual possession of the land or any part of it.

During the lifetime of Mr. English the character, location, and nature of the improvements (i. e., fences and house, etc.), and the manner and extent of use and cultivation remained as they were in and prior to 1890, except for deterioration of improvements.

The tract, improvements, etc., were "vacant" of actual occupation from the time the family left in 1916 until some undisclosed date after Mr. English's death. Cole (or Combs), with permission of the "heirs" or some of them, occupied the premises for about a year in 1917–1918.

Arney moved into the neighborhood in 1916. In June, 1918, the condition of the property was such as to make him think, he said, that anybody might take it and use it. He moved in and began occupation without "anybody's permission" and stayed until

February, next. Mrs. Cox, purporting to act as agent for the "heirs" and with authority of some of them, appeared in January and told Arney to vacate. He prepared to do so, but before he got away Mrs. Cox brought suit for his ouster. He described the condition of the property (when he took possession):

"There were no fences to amount to anything; there had been some old fences, but they were all about down; the house was in pretty bad condition; it had no windows and a part of the floor was out."

At a subsequent date Sims (who had resided in the neighborhood and had known Mr. English for thirty years) took possession of the eastern part of the tract (including the whole or part of the portion now in controversy) and continued its use up to the time of the trial. He "rented" the "West half," with the "house," from Mrs. Cox in 1923, and still occupies it. He said:

"I just rented the house from Mrs. Cox. When I went there I hadn't rented the other from anybody, and I haven't rented the other part from any body since." "When he went there," he said, "there was no fence * * * at all"; "there was an old piece of fence around the whole tract, but I would not call it a fence— it marked the line, but it was all down."

Rodgers, it will be recalled, testified that his son "ran a fence in the ten-foot strip." Sims referred to that incident in this wise:

"Mr. Rodgers' son put one wire across about one hundred yards. He done that about five or six months ago. [The trial was in January, 1926.] I went out and protested. I was out there with him. I said, 'Who does this property belong to?' and he said it belonged to him. * * * Rodgers said it was his and that his lawyer advised him to put a fence across there."

Mrs. Zella Edens (born English, in 1905) testified:

"I never heard anything about the east end of this land being conveyed to Mr. Scott until this case was brought up. * * * All the time I lived there [i. e., 1905–1916] I never heard anybody claiming any part of this property. Nobody claimed to own it except my father. I don't know anything about him having made a deed."

Mr. Crutcher, in "the real estate business," said:

"I know who lived on it [i. e., the tract as a whole] in 1914 and 1917. * * * The way I happen to know, I had a customer for a tract of land adjoining it, * * * and while I had a customer out there we went all around the boundaries and come to this English tract, and he said, 'I wish you would get me a price on that tract there;' and I went over to see who owned it and to see if Mr. English still owned it, and met Mr. English and asked him if he still owned it, and he said, 'Yes.' I * * * asked him what he owned, and he said, 'All under this fence' [i. e., the entire tract]. That was in 1914. I asked Mr. English if he still owned the place, and he said, 'Yes,' "

Mr. Crutcher had known "this property" as far back as 1888 "when Flanders put this addition out" (the property is referred to as part of the "Flanders addition"). Some witnesses for Mrs. Scott claimed a street or road ("Leroy street") intersected the tract. Mr. Crutcher, for the "heirs," declared, "There has never been a Leroy street in there." He said, "I have seen that place too many times to talk about."

Weatherington, a "real estate man," witness for Mrs. Scott, had "known the property ["not lines or anything"] ever since 1887 or 1888, when Flanders [English's vendor] owned it. In 1889 and 1890" he "lived on the road down below" the tract and "knew the old man [English] in passing his place." At an undisclosed date (inferably, 1923) he found record title to the eastern portion in Scott and began a search for "the real party that owned it," which search did not include attempts to locate the English heirs, but did lead to discovery of Sims' occupancy (already mentioned).

Sims (referred to above) had lived in the neighborhood and known Mr. English thirty years before English's death; English had "worked" for him some; he "went through there" (i. e., through a "road" that "used" to "run through" the tract), he said, "peddling all the time"; he had been "down on these premises a thousand times"; he took possession of the eastern portion, as noted, and when Weatherington appeared (about 1923) and told him he (Weatherington) "had it in charge and that he [Sims] could use it for pasture and not let any one trespass on it" he then, and thereafter, recognized Weatherington's (purported) authority.

[1] 2. Since "cultivation, use, or enjoyment of the land" is essential to that "actual and visible appropriation" without which possession cannot ripen into prescriptive title, the periods of vacancy (lack of occupation, use, etc., in person or by tenants) intervening the family's moving away in 1916 and filing of Mrs. Scott's pleading in 1925 broke the requisite continuity. Dunn v. Taylor, 102 Tex. 80, 86, 113 S. W. 265; Phillipson v. Flynn, 83 Tex. 584, 19 S. W. 136; Carlock v. Willard (Tex. Civ. App.) writ denied, 149 S. W. 363, 365, and cases there cited; Smith v. Wood (Tex. Civ. App.) 229 S. W. 583, and cases there cited. Sequently, if prescriptive title exists, its perfection occurred prior to Arney's occupancy, e. g., in June, 1918, or, maybe, prior to the "moving away" in 1916.

[2] 3. Without doubt in the period from date of the McAleer conveyance to the date of the "moving away" in 1916 (or Arney's occupancy in 1918) there were ten years of continuous, peaceable possession with "cultivation, use, or enjoyment." Articles 5675, 5680, R. S. 1911; articles 5510, 5514, R. S. 1925. That, however, is not sufficient. There must have been, in addition, at least such pos-

session and appropriation "commenced and continued under a claim of right inconsistent with and hostile to the claim" of those having the McAleer title. Article 5681, R. S. 1911; art. 5515, R. S. 1925. In book language there must have been possession, etc., of "such a character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." Satterwhite v. Rosser, 61 Tex. 166, 171; Hurley v. Lockett, 72 Tex. 262, 12 S. W. 212; Bracken v. Jones, 63 Tex. 184; Mhoon v. Cain, 77 Tex. 316, 14 S. W. 24; Phillipson v. Flynn, supra; Dunn v. Taylor, supra; Bender v. Brooks, 103 Tex. 329, 334, 127 S. W. 168, Ann. Cas. 1913A, 559. "The facts must clearly show the adverse claim open in its nature." Richards v. Smith, 67 Tex. 610, 613, 4 S. W. 571. See, also, Chance v. Branch, 58 Tex. 490, and cases there cited.

[3] 4. In so far as the McAleer title is concerned actual possession, use, etc., by English and wife commenced at the exact instant of passage of title, for they remained in possession. Since livery of seizin, or anything comparable, has never been required in Texas, and since the evidence does not disclose any particular reason for the phenomena of continued possession, the transaction between English and wife and McAleer had something akin to an executory nature although title passed and the deed became executed. Or (as in reason is inferable) there may have been an arrangement (expressed or implied) whereby English and wife should retain possession at sufferance, etc. At all events and for obvious reason it cannot be supposed that adverse possession started with or instantly followed delivery of the deed. Cogent evidence would be required to establish that commencement, for otherwise it is an anomaly at once striking and suggestive of bad faith (not to be presumed) in the grantors. Their possession as commenced, or retained, was consistent with the deed (Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323; Eylar v. Eylar, 60 Tex. 315; Evans v. Templeton, 69 Tex. 375, 6 S. W. 843, 5 Am. St. Rep. 71; Johnson v. Nash's Heirs, 15 Tex. 419; Brooker v. Wright [Tex. Civ. App.] 216 S. W. 196); and, while it might have been sufficient to make inquiry a duty of one undertaking a further purchase (Collum v. Sanger Bros., 98 Tex. 162, 165, 82 S. W. 459, 83 S. W. 184; Ramirez v. Smith, 94 Tex. 184, 59 S. W. 258; Pondrum v. Gray [Tex. Com. App.] 1 S.W.[2d] 278), it would not in respect to the recent grantee be notice of a hostile claim. Adverse possession, if it exists at all, cannot be dated back to delivery of the deed. When, if ever, it began—consequently, how long it endured—are matters shrouded in much doubt.

[4] 5. The owner does not, of course, occupy the position of "an ordinary and casual observer"; he must "know the boundaries of his own land," e. g., "and ascertain the extent, meaning and locality of any settlement made within them without his authority." Brownson v. Scanlan, 59 Tex. 222, 226. But if the "settlement," etc., be with his authority, of necessity its making lacks notice of adverse claim.

[5] On the facts here it appears in respect to the element of "visible" appropriation—use, cultivation, improvements, etc.—that English and wife throughout the period of their occupancy did no more and no less than they had done prior to the McAleer conveyance or at the beginning of their occupancy with that title outstanding. That manner of occupancy, in view of the nature of its commencement, was not sufficient to constitute adverse possession (Evans v. Templeton, supra), because it did not, of itself, import a claim hostile to the McAleer title.

[6] 6. The "claim of right inconsistent with and hostile to the claim of another" includes more than "mental process" in the possessor; there must be "external circumstances discovering that inward intention." Titel v. Garland, 99 Tex. 201, 206, 87 S. W. 1152; Evans v. Templeton, supra.

[7] Except for the occupancy noticed in "5" above, the evidence relied upon by defendants in error is made up of the statements of Rodgers, Crutcher, and Mrs. Edens about Mr. English's claims of ownership.

The declaration which Mr. English made to Crutcher in 1914 was made within less than ten years of the vacancies happening in 1916, 1918, etc., mentioned in "2" above. Mr. English did not tell Crutcher that he had been claiming to own the entire tract, nor did he imply when he began the claim.

Mrs. Edens merely implied that her father "claimed to own it"; she gave no information about when he made the claim or how he gave it voice. In view of her age, the "claim" when and as asserted may as well have been within less than ten years of the periods of vacancy as at a more remote period.

In respect to the tract as a whole Rodgers' statement is this: "The land was all used and the old man claimed it as his land."

Rodgers' testimony in relation to the "ten-foot strip" and Mr. English's "claims" and complaints about it, obviously, was considered by the Court of Civil Appeals as having reference to the tract conveyed to McAleer. We perceive no just ground for so taking it.

But when such declarations as were made to or in the presence of Mrs. Edens and to Mr. Crutcher in 1914 are given backward relations and when all that Rodgers said (in reference to either of the portions conveyed or to the entire tract) is considered as ranging in time limited only by some date near that of the conveyances, at one end, and the death of Mr. English, at the other, there is proof only of this: To one person making specific inquiry and to a young daughter and

a son-in-law Mr. English made existence of his claim known. That is the extent of the "openness" of the hostile claim shown in evidence. And that, in fact, it was not more "notorious" is suggested in Mr. Crutcher's testimony indicating that he had been acquainted with the premises for a long time, and yet in 1914 he went to see who owned or claimed to own them, by the testimony of Weatherington and Sims (long time "acquaintances") indicating lack of information about a claim of ownership of the land now in controversy by English or his heirs and by the testimony of Arney to the implied effect that a residence of two years in the immediate neighborhood had failed to acquaint him with the claims of the "heirs" or, by relation, of the claims of Mr. English. And that, we think, is insufficient to establish the fact of requisite notoriety, since open assertion of the claim is not helped by actual occupancy, etc., because of its origin and manner as already noticed. The "facts" do not "clearly show the adverse claim open in its nature." Richards v. Smith, supra; Johnson v. Nash's Heirs, supra; Evans v. Templeton, supra; and other cases cited in "3" above.

Upon supposed authority of Smith v. Montes, 11 Tex. 24; Harn v. Smith, 79 Tex. 310, 15 S. W. 240, 23 Am. St. Rep. 340; Thomson v. Weisman, 98 Tex. 170, 82 S. W. 503; T. & P. Ry. Co. v. Maynard (Tex. Civ. App.) 51 S. W. 255; Pendleton v. McMains, 32 Tex. Civ. App. 575, 75 S. W. 349; and Dickey v. Forrester (Tex. Civ. App.) 148 S. W. 1181— the Court of Civil Appeals says that:

"The decisions of our courts" "are to the effect that a vendor, remaining in possession after deed by himself, claiming the land as his own, without notice other than the possession, may acquire title by limitation as against his purchaser."

If by "decision," thus used, is meant the point necessary to disposition of the case, the statement is incorrect, for in no one of the cases cited (or in any other with which we are familiar) was there such a "decision." Again, it will be noted: It is said that the vendor remaining in possession "may" acquire prescriptive title "without notice other than possession" provided he claims "the land as his own." It has not been decided, in a case where the point was material, that a vendor, thus situated, did acquire title. A general observation may be taken of each of the cases cited: The material point was whether a deed (or a judgment) estopped or otherwise precluded adverse claim and possession; in each case there was something more in the way of notice, etc., than "possession."

In Smith v. Montes a material issue, supported by evidence, was that the deed was a forgery or "swindle" and without any consideration, or was given as mere security.

And "there was not a scintilla of evidence" that the vendee "had ever claimed property in the lot, or exercised or pretended ownership, or did any act in relation thereto, except the admission" of the vendee "that he had no title, and that the deed was taken merely as security."

Owners of adjoining tracts agreed upon a boundary and a fence was erected on the agreed line. Thereafter "defendant" had, according to evidence, "exclusive, adverse, and continuous possession" up to the fence "occupying and claiming the same as her own, for more than ten years." About this, it is said in Harn v. Smith, "there is no question."

In Thomson v. Weisman it appears that the claimant, in possession, did acts of ownership, such as conveyances, leases, etc., inter sese.

T. & P. Ry. Co. v. Maynard exhibits original fencing (and cultivation within the fences) by the grantor of distinct parts of the land previously conveyed, leaving the grantee in possession and use of but a part.

In Pendleton v. McMains it is said:

"It was established by uncontroverted evidence that the land in controversy has been inclosed by a fence since 1881, and defendants in error have been in the peaceable, continuous, open, and adverse possession of the same," etc., "after the judgment [in subordination to which it was claimed they held by operation of law] was obtained."

Dickey v. Forrester includes a showing of "leasing" by the grantor after deed made, with evidence tending to show mutual mistake in the description in the deed. The holdings supposed to uphold the expression of the Court of Civil Appeals here (as in Pendleton v. McMains, etc.) rests upon a presupposition of showing of adversity of possession, etc.

There may be, and probably are, cases of possession which is sufficient of itself to give notice, but in them there will appear some visible evidence in the manner of possession, such as erection of improvements which, ordinarily, are not erected except by owners or those claiming to be owners—and no such case is exhibited in this record.

7. In our opinion the evidence, as a matter of law, does not support the claims of prescriptive title, and, in consequence, we recommend reversal of the judgments of the district court and Court of Civil Appeals and rendition of judgment for the plaintiff in error, Mrs. Jane Leven Scott.

CURETON, C. J. Judgments of the Court of Civil Appeals and district court both reversed, and judgment rendered for the plaintiff in error, as recommended by the Commission of Appeals.