**Debra BODIN, Astor Morgan, David Dyson, Clomare Trahan**

v.

**GULF OIL CORPORATION, Sun Oil Company, Texaco Inc. Exxon USA, Inc.**

**Civ. A. No. B–86–1169–CA.**

United States District Court, E.D. Texas, Beaumont Division.

July 21, 1988.

Tim Hatton, Xenia, Ohio, for plaintiffs.

William N. Blanton, III, Michael C. Smith, Houston, Tex., Morris Harrell, Michael Powell, Cynthia Keely Tims, Karen O'Connor, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

COBB, District Judge.

This suit is a wrongful conversion action filed by the heirs of James Dyson against Chevron U.S.A., Inc., Sun Exploration and Production Company, and Exxon USA, Inc. Plaintiffs contend they are the rightful owners of a tract of land now located in Orange County, Texas, known as the James Dyson League, Abstract 8, being 4428 acres of land, in Jefferson County, Texas. Such land later was included in Orange County, Texas, when that county was organized in 1852. Plaintiffs demand "[t]hat the defendants ... be required to account to plaintiff[s] for minerals removed from the property ... [and] [t]hat the defendants ... be assessed for and required to pay plaintiff[s] damages for their unlawful extraction of minerals from the property." *Plaintiffs' Complaint at 2.*

All three defendants have moved for summary judgment on the ground that plaintiffs cannot establish the requisite possessory interest in the extracted minerals to support their conversion claims. Alternatively, defendants Chevron and Exxon have moved for summary judgment on the ground that plaintiffs' conversion claims are barred by the two-year statute of limitations, 16.003(a), TEX.CIV.PRAC. & REM. CODE ANN. (Vernon 1986).

## I.

## PLAINTIFFS' POSSESSORY INTEREST

■ Although oil and gas beneath the surface of the land are considered part of the realty, once removed from the soil they become personalty. *Humble Oil & Refining Co. v. West,* 508 S.W.2d 812, 817 (Tex. 1974) ("once severed from the realty, gas and oil, like other minerals, become personal property"); *W.B. Johnson Drilling Co. v. Lacy,* 336 S.W.2d 230, 233 (Tex.Civ.App. —Eastland 1960, no writ) ("a conversion of the sale of the proceeds of oil, or a conversion of the oil itself after it was produced and severed from the land would be a conversion of personal property, not a conversion of realty"); *Pan American Petroleum Corp. v. Orr,* 319 F.2d 612, 613 (5th Cir.1963) (Texas two-year statute of limitations governing actions for conversion of personal property held applicable to action to recover the value of oil and gas severed from the land). *See also,* 55 Tex.Jur.3d, *Oil & Gas,* § 8 (1987). Plaintiffs seek remuneration for the value of oil and gas extracted from Abstract No. 8. Therefore, plaintiffs' claims are governed by principles of conversion.

Conversion is an unauthorized and wrongful exercise of dominion and control over another's personal property, to the exclusion of, or inconsistent with the rights of the owner. *Catania v. Garage De Le Paix, Inc.,* 542 S.W.2d 239, 241 (Tex.Civ. App.—Tyler 1976, writ ref'd n.r.e.), and authorities cited therein. It is essential that the plaintiff establish some interest in the property as of the time of the alleged conversion, such as title or otherwise some right to possession. *Id.* at 241. A plaintiff who has not shown title or some other right to possession of the property allegedly converted may not maintain a suit in conversion. *Id.* at 242.

To show their superior possessory interest in the extracted minerals, plaintiffs pleaded the following chain of title to Abstract No. 8:

1. That in 1835, James Dyson was granted by Mexico title to ... Abstract No. 8, James Dyson Survey located in Orange County, Texas.

2. That James Dyson died testate in 1883, leaving his wife Katherine as his sole heir at law.

3. That plaintiff's [sic] are descendants and heirs of James Dyson....

4. That at the time of James Dyson's death he was still lawfully seized of the property described ... above.

*Plaintiff's Complaint at 2.*

Defendants contend that plaintiffs cannot show any possessory interest in the extracted minerals because James Dyson conveyed Abstract No. 8 out of his estate by executing three deeds, two in 1837, and one in 1845. Therefore, defendants assert that Abstract No. 8 was not part of his estate when he died, and did not pass to his wife or heirs as plaintiffs claim.

The defendants have come forward and produced fully certified, recorded and authenticated copies of the three deeds in support of their motion. *See,* pages 878 and 879, *infra.*

In response to defendants' summary judgment proof, plaintiffs initially attacked the validity of the deeds on four levels, arguing that (1) the deeds are not authentic; (2) the deeds were executed under duress; (3) the conveyances violated a condition subsequent of the original Mexican land grant; and (4) the conveyances violated principles of community property law because James Dyson's wife did not sign all three deeds.

In the final summary judgment hearing, plaintiffs abandoned all four of these arguments. The court considers such abandonment proper for the following reasons:

First, plaintiffs were unable to produce any evidence to undermine the defendants' proof of authenticity. Thus, the defendants carried their burden of production and persuasion, showing that the deeds were authentic.

■ Second, the only evidence of duress came from James Dyson's will, executed in 1880, wherein he states in part:

At this time, I feel my fate to be the same as my two beloved, murdered brothers. Having their property stolen from them after a long and courageous battle to maintain their God-given right to their land. I pray that I not suffer a similar fate, though at this time I do fear for my life.

*James Dyson Will at 2.*

Plaintiffs have come forward with no evidence to link James Dyson's fear expressed in 1880 which would have any bearing on the three deeds he executed at least thirty-five years before he wrote his will. Such proof is insufficient to undermine the validity of the three deeds as a matter of law; no reasonable mind could conclude that the Dyson 1880 will shows that the three prior deeds were executed under duress.

■ Third, as to the alleged violation of the Mexican land grant condition, it has long been established that the power to enforce such condition lies with the sovereign, the State of Texas. *Hancock v. McKinney,* 7 Tex. 384 (1851); *Johnson v. Smith,* 21 Tex. 722 (1858); *Flores v. Hovel,* 125 S.W. 606 (Tex.Civ.App.—1910, no writ).

Finally, plaintiffs readily concede that Katherine Dyson signed the November 6, 1837, Runnels deed, which conveyed the lower half of Abstract No. 8. The Runnels deed referred to the prior Whiting conveyance, and thus ratified the Whiting deed. Together, the Whiting and Runnels deeds show that James Dyson divested himself of title to all of Abstract No. 8 before he died. The community property arguments are thus of no avail to plaintiffs.

The plaintiffs have failed to generate any genuine issue of fact as to the validity of the 1837 and 1845 conveyances. Therefore, the court holds the defendants have met their burden as movants and conclusively shown by summary judgment proof that:

1. James Dyson executed a deed on November 1, 1837, which conveyed the northern half of Abstract No. 8 to Samuel Whiting.

2. On November 6, 1837, James Dyson conveyed the southern half of Abstract No. 8 to H.D. Runnels.

3. On February 5, 1845, James Dyson reconveyed all of Abstract No. 8 to a E.D. LeGrande.

Being unable to produce to the court summary judgment evidence sufficient to undermine defendants' proof that Dyson had disposed of all of his interest in the Dyson League by 1845 at the latest, plaintiffs attempted to show that James Dyson reacquired title to Abstract No. 8 before he died. Plaintiffs advanced three theories of reacquisition: (1) Redemption, (2) adverse possession, and (3) presumed grant.

## A.

### REDEMPTION

Plaintiffs contend that James Dyson redeemed Abstract No. 8 by paying back-taxes on the property. The court rejects plaintiffs' redemption theory.

■ It is the law in Texas that the paying of back taxes only clears the tax lien for the rightful owner. *Hardy v. Brown*, 46 S.W. 385, 386 (Tex.Civ.App.—1898, writ ref'd); *Jackson v. Maddox*, 117 S.W. 185 (Tex.Civ.App.—1909, no writ). Paying the back taxes does not vest one with title. *See also, McGuire v. Bond*, 271 S.W.2d 508, 511 (Tex.Civ.App.—El Paso 1954, writ. ref'd n.r.e.). Thus, even if the court assumes that James Dyson did pay back taxes on the property, and "redeemed the property," plaintiffs would still have to show that he was the rightful owner of the property. Thus, plaintiffs' redemption argument begs the question. Redemption in and of itself does not prove ownership. Redemption statutes in Texas are liberally construed so that anyone with a connection with the property, for example, a previous grantor or grantee, has the authority to redeem the property. *See Jackson, supra.* The redemption statutes do not give the previous grantor or grantee the power to reacquire title to the property; they simply put such party in a position to clear the tax lien and claim the property to the extent that he can otherwise show that he is the rightful owner. If later litigation reveals that he is not the rightful owner, then he is only entitled to be compensated for the money that he paid in redeeming the property. *Meador Bros. v. Hines*, 165 S.W. 915, 922 (Tex.Civ.App.—Amarillo 1914, writ ref'd). Plaintiffs have failed to produce evidence of a genuine factual issue under a theory of redemption.

## B.

### ADVERSE POSSESSION

Texas has recognized title by limitation statutes since 1836. The statutes in effect during the mid to late 1800s are found in Vol. I—*Paschal, A Digest of the Laws of Texas,* pp. 765–772 (1875) and II, *Sayles' Annotated Civil Statutes of the State of Texas,* pp. 1231–1245 (1897).[1]

---

1. The various statutes appear as follows:

Art. 1421, enacted February 5, 1841:

The person who has or shall have right of entry into any real estate, consisting of lands, tenements, or hereditaments, shall make entry therein within ten years next after this right shall have accrued, and on failure shall be forever barred thereafter.....

(This does not mean that the owner must make actual entry within ten years, or be thereafter debarred. *Barton v. Crawford,* 10 Tex. 858. It applies only to cases of adverse possession. *Redding v. Redding,* 15 Tex. 251. The title here, as elsewhere in the American states, draws to it the legal seizen and possession, which are retained by the grantee, until he is ousted thereof by an actual possession in another under a claim of right. (2 Smith's Leading Cases, p. 413, and notes; Angell on Limitation 400.) *Horton v. Crawford,* 10 Tex. 388. There is no legal necessity for entry, unless the land be claimed and held adversely by another.)

Art. 4622:

Every suit, to be instituted to recover real estate, as against him, her, or them, in possession under title, or color of title, shall be instituted within three years next after the cause of action shall have accrued, and not afterwards; but in this limitation, is not to be computed the duration of disability to sue from the minority, coverture or insanity of him, her, or them having cause of action. By the term title, as used in this section, is meant a regular chain of transfer from or under the sovereignty of the soil: and color of title is constituted by a consecutive chain of such transfer down to him, her, or them in possession, without being regular; as if one or more of the memorials or muniments be not registered, or not duly registered, or be only in writing, or such like defect as may not exend to, or include the want of intrinsic fairness

In order to obtain title by limitations, it is necessary that there be exclusive use, claim and possession that is an open, notorious, hostile, and visible appropriation for the time provided by statute. *W.T. Carter & Bro. v. Ruth*, 275 S.W.2d 126 (Tex.Civ.App.—Beaumont 1955, no writ). The main facts that must be shown are the character of the use to which the land was put, and the activities performed on the land by the possessor so as to apprise others that the party in possession is claiming title to the land in opposition to all others. *McDown v. Rabb*, 26 Tex. 154 (1882); *Hardy v. Bumpstead*, 41 S.W.2d 226 (Tex.Com.App.1931, no writ). While occupancy is not essential, there must be continuous use, cultivation or enjoyment in order to provide the requisite notice of adverse claim. *Niday v. Cochran*, 92 S.W. 1027 (Tex.Civ.App.1906, no writ). The claim must be visibly hostile to the true owner's right.

Although payment of taxes is not required to establish title by limitation except under the five-year statute, the fact that claimant paid them is a circumstance that supports his contentions. *Stubblefield v. Hanson*, 94 S.W. 406 (Tex.Civ.App.—1906, no writ). The tax assessors' list is evidence of whether a party claimed the land. *Webb v. Lyerla*, 94 S.W. 1095 (Tex.Civ.App.—1906, writ ref'd). However, the claimant must prove that taxes were in fact paid, which is not met by showing that the lands were only rendered for taxation in the name of the claimant. *French v. Olla*, 30 S.W. 568 (Tex.1887).

A vendor of land may reacquire property adversely after title has passed to the vendee, provided there is clear, unequivocal evidence showing the vendor remained in the undisturbed and exclusive possession of the property without recognition of the vendee's rights. *Smith v. Montes*, 11 Tex. 24, 27 (1853). Where a grantor is claiming title by adverse possession as against a grantee, it cannot be presumed that adverse possession started with or instantly followed delivery of the deed. *Scott v. Rodgers*, 6 S.W.2d 731, 734 (Tex.Com.App.

and honesty; or when the party in possession shall hold the same by a certificate of headright, land warrant, or land scrip, with a chain of transfer down to him, her, or them in possession; and provided, this section shall not bar the right of the government.
Art. 4623:
He, she, or they, who shall have had five years' like peaceable possession of real estate, cultivating, using, or enjoying the same and paying tax thereon, if any, and claiming under a deed, or deeds, duly registered, shall be held to have full title, precluding all claims; but shall not bar the government; and saving to the person or persons having superior right and cause of action, the duration of disability to sue arising from nonage, coverture, or insanity.
Art. 4624:
Ten years of such peaceable possession and cultivation, use, or enjoyment thereof, without any evidence of title, shall give to such naked possessor full property precursive of all other claims, in and to six hundred and forty acres of land, including his, her, or their improvement,—yet the right of the government is not to be barred; and there is saved to the person or persons having the title and cause of action, the duration of disability to sue from nonage, coverture, or insanity.
Art. 3340:
Every suit to be instituted to recover real estate, as against any person in peaceable and adverse possession thereof under title or color of title, shall be instituted within three years next after the cause of action shall have ccrued, and not afterward.
Article 3342, enacted in 1879:
Every suit to be instituted to recover real estate as against any person having peaceable and adverse possession thereof, cultivating, using or enjoying the same and paying taxes thereon, if any, and claiming under a deed or deeds duly registered, shall be instituted within five years next after the cause of action shall have accrued, and not afterward; provided, that this article shall not apply to any one in possession of land, who in the absence of this article would deraign title through a forged deed; provided, further, that no one claiming under a forged deed or deed executed under a forged power of attorney, shall be allowed the benefits of this article.
Article 3343:
Any person who has the right of action for the recovery of any lands, tenements or hereditaments aainst another having peaceable and adverse possession thereof, cultivating, using or enjoying the same, shall institute his suit therefore within ten years next after his cause of action shall have accrued, and not afterward.
Article 3349:
"Adverse possession" is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another.

1928, no writ). Cogent evidence is required to establish a point in time when the grantor's adverse possession commenced. *Id.* at 734. The law must presume, absent such cogent evidence, that the grantor's possession as commenced, or retained, was consistent with the deed; the law presumes there must have been an arrangement, express or implied, that the grantor would remain in possession at sufferance. *Id.* at 734. The grantor's continued possession, standing alone, is insufficient to give the immediate grantee notice of the hostile claim. At 734.

The plaintiffs submitted the following evidence to show reacquisition by adverse possession:

* The affidavit of D.A. Richard, purportedly executed in 1964, when he was 91 years old. Plaintiffs recorded the affidavit in Vermilion Parish, Louisiana, on November 26, 1986, almost three months after plaintiffs instituted this lawsuit. In the affidavit, Richard contends that Dyson and his wife were residents of Orange County, Texas, until 1850. In 1850, James Dyson sent his wife to Louisiana, because of apparent problems with cattle rustling.

* Plaintiffs' attorney supplemented the Richard affidavit with his own, wherein he states that no records of Orange County reflect that James Dyson ever received title to any other property.

* Evidence showing that James Dyson paid taxes on the property for the year 1837 in 1838.

* Plaintiffs submitted records showing that on November 15, 1858, a cattle brand was registered in Orange County under the name of Katherine Dyson, the name of James Dyson's wife. In addition, plaintiffs submit records indicating that on March 7, 1859, a hog mark was registered to Thomas Dyson, son of James Dyson.

* Plaintiffs' contend Dyson redeemed the property in 1880. However, plaintiffs have failed to submit any properly authenticated records to indicate that there has been any record of redemption.

* Plaintiffs submit an excerpt from *Gateway to Texas*, apparently an historical writing of some sort published in 1986, written by Dr. Howard C. Williams, at p. 93:

[On September 13, 1865, a hurricane struck Orange County]. The only houses that withstood the storm were the Ochiltree house in the River, the D. Call Home on Third and Main, and a house that stood on the property near the T & N O Railroad, now owned by Mrs. Brazeal.

* An affidavit dated August 22, 1987, of Olan Dyson and an affidavit of Debora Bodin dated August 24, 1987, were submitted which state that "apparently" a house known as the Dyson homestead was located on the property until 1963. Olan Dyson's knowledge came from his mother, Audrey May Dyson. She was born on August 6, 1919, and died in 1987. Debora Bodin's knowledge came from discussing the property with "persons there (in Orange County) and in other places."

* In 1890, James Dyson's family instituted a suit for the recovery of the north half of Abstract No. 8.

* A deed, dated April 25, 1935, from Numa Miller to F. Douset, J.F. Combs, and Martin Manuel, for one-fourth of Miller's claim to the property by virtue of being an heir of James Dyson.

* A quitclaim deed, dated March 21, 1935, recorded in Louisiana, but never recorded in Texas, from Edmund Dyson to W.C. Heinen, wherein it is stated that in consideration of $234.00, Dyson and wife convey one-half of their rights and interest to James Dyson Survey, and any cash or money accrued or to be accrued, and any bonds or stock in any company or the United States government, or any other article or thing of value, and any other land in a locality, in which we may be interested.

* The probate papers of the estate of the widow of W.C. Heinen, which listed the claim to one half of Edmund Dyson's claim to the property as part of Mrs.

Heinen's assets, and valued at One Dollar.

* Photographs of the property that show a sign for a "Heinen Farm" with crawfish bucket cuisine.

Curiously, after over two years of opportunity, plaintiffs have never fully articulated under which adverse statute they claim, and during what time period James Dyson possessed the property adversely. Despite this omission, the court has carefully considered plaintiffs' adverse possession claim, for all theories of adverse possession have one thing in common: a point in time at which the alleged possession, use or enjoyment, comes to be hostile, open and notorious. Unfortunately for plaintiffs, they cannot produce sufficient evidence to show a claim by hostile possession. From the evidence produced by the plaintiffs, no reasonable mind could conclude that James Dyson reacquired title to Abstract No. 8 by adverse possession prior to his death. Therefore, the court holds that plaintiffs have failed to generate a genuine factual issue under the theory of adverse possession.

■ It should be noted at the outset that during the time period in which plaintiffs could possibly claim James Dyson adversely possessed Abstract No. 8, Texas had only three adverse possession statutes, which established a three, five, and ten-year period of limitation. The three and five year statutes can properly be excluded from consideration out of hand because (1) the plaintiffs have no color of title to Abstract No. 8—a requisite of the three-year statute—and (2) plaintiffs have no evidence that Dyson paid all taxes on the property for a continuous five-year period after he conveyed the property in 1837 and again in 1845, a requisite of the five-year statute. Thus, the plaintiffs necessarily must establish James Dyson's adverse possession for a period of ten years. Their evidence is insufficient to show a genuine issue of fact under the ten-year statute of limitations.

### 1. Residency Until 1850 and No Other Recorded Land Holdings.

■ The fact that James Dyson, et ux, resided in Orange County, Texas, until 1850 is no evidence of hostile possession. As a grantor, mere possession does not constitute adverse possession. Additionally, the title records do not evidence any hostile claim, except for the LeGrande conveyance. However, the LeGrande conveyance divested James Dyson of any title he may have adversely obtained up to 1845. Therefore, the LeGrande conveyance does not benefit plaintiffs.

Proof of no other records of ownership after the 1837 conveyances is not enough to show a hostile claim because such proof is fully consistent with the presumption that a grantor in possession remains at sufferance.

The 1838 tax payment covers the year 1837, when James Dyson still owned the property. Thus, such payment is no evidence of a hostile claim. Any other tax records show at most that the property may have been rendered in his name. Plaintiffs must show actual payment by Dyson, not the mere fact he, or someone for him, rendered the land for taxation. Moreover, the tax evidence reveals no continuity in the payment of taxes for three, five, or ten years.

After 1845, and between 1850, plaintiffs can only show at most that James Dyson resided in Orange County. Again, no evidence of hostile possession exists. Notwithstanding the conspicuous absence of a hostile claim, after 1850 and before 1858, plaintiffs have no evidence of possession, as census records indicate that a James Dyson, age 57, resided in Vermillion Parish, Louisiana, with an occupation of boatman, who was born in Louisiana. The census also lists wife Katherine, age 46, son William, age 13, and Israel, age 11, and daugher Evelyn, age 15. The census data is consistent with the information provided by the plaintiffs as to James Dyson's children and their ages. Therefore, between 1837 and 1858, plaintiffs have not produced sufficient evidence to support a claim by adverse possession.

### 2. Cattle Brands and Hog Marks

■ In 1858 and 1859, plaintiffs have evidence of registered cattle brands and

hog marks. Such registration is in no way linked to Abstract No. 8. Standing alone, such evidence is no evidence of hostile possession. Cattle brand registrations do not prove occupancy, use or possession of any particular piece of real property, or any real property at all. They are only hallmarks to be affixed to personal property as indicia of ownership of that particular personal property. They do not prove any cattle were actually run by Dyson in Orange or Jefferson County, or where Dyson's cattle, if any, were pastured. Absent a link to Abstract No. 8, such records of registration are meaningless. They have no probative value.

### 3. *The Redemption Records, the Will and the House.*

Between 1859 and 1880, there are only three pieces of evidence which even remotely link James Dyson to Abstract No. 8:

1. His will, which makes no specific reference to Abstract No. 8;

2. A purported redemption record; and

3. A house built on Abstract No. 8 after 1865 and left standing until 1963.

None of these three supports plaintiffs' claims.

■ The claim of right inconsistent with and hostile to the claim of another includes more than mental process in the possession; there must be external circumstances disclosing and evidencing such hostile intention and possession. *Scott v. Rodgers,* 6 S.W.2d 734. A will that was never probated, nor filed until 1986 in the Deed Records of Brazos County, Texas, approximately 150 miles west of Orange, Texas, and never recorded in Orange County, Texas, constitutes nothing more than a private recordation of a mental process. Such a will prior to 1986 cannot even remotely constitute notice of a hostile claim to Abstract No. 8. The court can make no reasonable inference concerning adverse possession from James Dyson's unprobated will.

The purported redemption record is of little, if any, help to plaintiffs. The most far-reaching inference to be drawn from such record is that James Dyson had a past connection with the land. As stated before, redemption is no evidence of ownership.

Finally, the hurricane of 1865 and the subsequent house construction do not revive plaintiff's claim. There is no indication of when after 1865 the structure was built, who built it, or who occupied it, and for how long. The answers to these questions are shrouded in darkness. A darkness that the plaintiffs have a burden to lift before a reasonable mind could conclude that James Dyson reacquired Abstract No. 8 by adverse possession prior to his death.

### 4. *The 1890 Non–Suit, Crawfish and Stray Deeds*

■ The remaining evidence—the 1890 non-suit, pictures of the crawfish farm, and various deeds and probate papers surfacing in the 1930s—fails to establish adverse possession before James Dyson died.

The effect of a non-suit is in no way an adjudication or assertion of rights, as it only places the parties in the position they were in if suit had never been brought. *Crofts v. Court of Civil Appeals,* 362 S.W. 2d 101 (Tex.1962).

The 1930 deeds and probate papers rest on the extent of James Dyson's estate at his death. Therefore, such evidence is of no value without an affirmative determination that Dyson adversely possessed the property and reacquired all of the League before he died. The court concludes that no reasonable mind could infer that James Dyson reacquired Abstract No. 8, and thus, such deeds are proof of nothing; they beg the question; they assume the very point which must be proved.

### 5. *Conclusion on Adverse Possession.*

Having carefully examined all the evidence, and having drawn all permissible inferences in favor of the plaintiff, the court concludes that plaintiffs cannot establish all the elements of adverse possession for the requisite period of time under any of the statutes of limitation of Texas. The gaps in evidence are too great for a reasonable mind to conclude otherwise.

There is no evidence of Dyson's purported use of the land, insufficient evidence of any hostile claim, very limited evidence of possession which places the Dysons at most in Orange County, Texas, never on Abstract No. 8. Moreover, none of the evidence of possession rebuts the presumption that James Dyson remained at sufferance to his grantees. Therefore, the court rejects plaintiffs' theory of adverse possession.

## C.

### PRESUMED GRANT

■ The doctrine of presumed grant is designed to quiet title where there is (1) a long period of occupancy and dominion of the land by one party, that is (2) inconsistent with the record ownership vested in another party, during which time (3) the legal owner did not attempt to exercise any rights. *Magee v. Paul*, 110 Tex. 470, 221 S.W. 254 (Tex.1920). If these three conditions can be met, the law will presume there must have been a grant that explains the legal owner's failure to act.

In this case, the plaintiffs simply cannot clear the first hurdle of this rule. Any evidence of occupation by the plaintiffs' ancestors after the 1837 and 1845 conveyances is very speculative, and sparse at best. Moreover, none of the evidence of possession rises to a level sufficient to rebut the presumption that James Dyson stood at sufferance to his grantees after the 1837 and 1845 conveyances. Thus, no reasonable mind could conclude from the evidence generated by plaintiff that James Dyson reacquired Abstract No. 8 under the theory of presumed grant. Additionally, the recorded activity of the owners of the land after 1845 is extensive, which shows that the record owners indeed actively asserted their rights. Therefore, the plaintiffs cannot establish any facts from which a reasonable mind could conclude that the legal owners did not attempt to exercise any rights in the time period in which plaintiffs claim they possessed the property. For these reasons, the court rejects plaintiffs' theory that James Dyson reacquired the property prior to his death by presumed grant.

### D. CONCLUSION ON PLAINTIFFS' POSSESSORY INTEREST

The summary judgment evidence in this case shows that James Dyson conveyed the entire property in question in 1837, and he attempted to convey that entire property again in 1845. Plaintiffs have failed to come forward with competent, admissible summary judgment evidence demonstrating that there are genuine issues of fact as to any theory of reacquisition. Therefore, plaintiffs can show no possessory interest to support their conversion claims. Under this state of the evidence, defendants have met their burden of pursuading the court that there are no genuine issues of material fact. Therefore, they are entitled to judgment as a matter of law. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II.

### STATUTE OF LIMITATIONS

■ As considered above, there is no question that plaintiffs' claims are for conversion of personal property. *See, Humble Oil & Refining Co. v. West*, 508 S.W.2d at 817, *supra*. Such claims are governed by § 16.003(a) of the TEX.PRAC. & REM. CODE ANN. (Vernon 1986). Section 16.-003(a) requires litigants to bring their conversion claims within two years of accrual. Where a tort-feasor's original possession is lawful—for example, under a bailment contract—the conversion accrues when (1) the true owner, or one claiming superior possessory rights, demands that the goods be returned and the tort-feasor refuses to return the property, or (2) the tort-feasor unequivocally exercises dominion over the property inconsistent with the claims of the owner or the person entitled to possession such that the owner actually knew of the conversion, or by the use of reasonable diligence, should have learned of the conversion. *Las Mendozas, Inc., v. Powell*, 368 F.2d 445, 450 (5th Cir.1966). Where the tort-feasor originally gains possession without legal authority, the conversion accrues when the act of conversion is com-

plete, for example, when oil is wrongfully taken from the ground. Whether or not the owner knows of the conversion does not keep the limitation time from running. *Meyer Bros. Drug. Co. v. Fry*, 48 S.W. 752 (Tex.Civ.App.1898, no writ); *Davidson v. Atmar*, 243 S.W. 662, 664 (Tex.Civ.App.—Beaumont 1922, no writ); *Cotten v. Heimbecher*, 48 S.W.2d 402, 404 (Tex.Civ.App.—Amarillo 1932, no writ); *Republic Supply Co. v. French Oil Co.*, 392 S.W.2d 462 (Tex.Civ.App.—El Paso 1965, no writ), unless the defendant acted fraudulently by attempting to hide his act of conversion. *Davidson v. Atmar*, 243 S.W. at 664. The cases which hold that the statute runs regardless of the plaintiff's knowledge are based on the presumption that ignorance of the conversion is the result of the true owner's lack of diligence, and he cannot take advantage of his own fault. 18 Am. Jur.2d, *Conversion*, § 94 at 211.

According to plaintiffs' theory of the case, the defendants never had legal authority to extract the minerals from Abstract No. 8. Therefore, plaintiffs' claims accrued when the act of taking the oil and gas from the ground was complete.

Plaintiffs filed this action on August 28, 1986. Defendants Chevron and Exxon have presented uncontroverted proof that they ceased all extraction operations at least two years before August 28, 1986. Therefore, plaintiffs' conversion claims are barred as to defendants Chevron and Exxon.

### III.

For the above reasons, it is hereby ORDERED, ADJUDGED and DECREED that defendants' motions for summary judgment are in all things GRANTED.